# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROY MILLER III,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Case No.: 1:22-cv-01403-ELH** |
| ) | |
| **NFL PLAYER DISABILITY AND** ) | |
| **NEUROCOGNITIVE BENEFIT** ) | |
| **PLAN,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DEFENDANTS' COMBINED
## OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## — AND —
## REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 3

    I.    The Court Should Reject Miller's Attempt To Side-Step The Board's
        Discretionary Authority To Interpret The Terms Of The Plan On The Theory
        That There Is Only One Objectively Reasonable Interpretation Of The Term
        "Disability(ies)." ................................................................................................ 3

    II.    The Board's Interpretation Of The Term "Disability(ies)" Was Reasonable
        And Consistent With The Intent Of The Plan, And Miller's Attempts To
        Prove Otherwise Are Meritless .......................................................................... 6

    III.    Miller Has No Basis To Suggest That The Board Has Treated Him
        Differently Or Offered Inconsistent Plan Interpretations. ................................... 8

    IV.    There Is No Structural Conflict, And No Reason To Lessen The High Level
        Of Deference This Court Owes To The Board's Decision. .................................. 11

    V.    Remand To The Board Is The Appropriate Remedy If The Court Finds That
        the Board Abused Its Discretion. ...................................................................... 15

CONCLUSION .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,*
  201 F.3d 335 (4th Cir. 2000) ........................................................................ 1, 7

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  796 F. Supp. 2d 682 (D. Md. 2011) ................................................................ 12

*Cason v. Nat'l Football League Players Ass'n,*
  538 F. Supp. 3d 100 (D.D.C. 2021) ................................................................ 14

*Curtiss-Wright Corp. v. Schoonejongen,*
  514 U.S. 73, 115 S. Ct. 1223, 131 L.Ed.2d 94 (1995) ...................................... 14

*Durakovic v. Bldg. Serv. 32 BJ Pension Fund,*
  609 F.3d 133 (2d Cir. 2010) ........................................................................... 11

*Evans v. Eaton Corp. Long Term Disability Plan,*
  514 F.3d 315 (4th Cir. 2008) ......................................................................... 16

*Gates v. Prudential Ins. Co. of Am.,*
  240 A.D. 444 (N.Y. App. Div. 1934) ................................................................. 4

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  925 F. Supp. 2d 700 (D. Md. 2012) (Hollander, D.J.) ..................................... 11

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  No. CIV.A. ELH-12-634, 2013 WL 6909200 (D. Md. Dec. 31, 2013) (Hollander,
  D.J.) ........................................................................................................ 10, 11

*Grabowski v. Hartford Life & Accident Ins. Co.,*
  747 F. App'x 923 (4th Cir. 2018) ..................................................................... 1

*Griffin v. Hartford Life & Accident Ins. Co.,*
  898 F.3d 371 (4th Cir. 2018) ......................................................................... 15

*Piepenhagen v. Old Dominion Freight Line, Inc.,*
  395 F. App'x 950 (4th Cir. 2010) ................................................................... 15

*Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  No. 1:08-cv-01870-WMN (D. Md. Oct. 22, 2008), Dkt. 22 ......................... 12, 13

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  No. 1:09-cv-02612-WDQ, 2011 WL 10005532 (D. Md. Jan. 13, 2011) .......... 12, 13

*Strauch v. Exelon Corp.*,
   No. CIV. JKB-13-1543, 2013 WL 6092520 (D. Md. Nov. 18, 2013)................................. 1

## <u>INTRODUCTION</u>

The parties agree that this case presents a narrow question of Plan interpretation. *See* Pl.'s Mem. in Support of Mot. for Sum. Jgmt. and in Opp. to Defs.' Mot. for Jgmt. on the Admin. Record ("Pl.'s Mem.," Dkt. 35-1) at 10 ("Here, the question is purely one of plan interpretation …"). As a result, the sole, disputed issue is essentially a question of law that is answered by settled, ERISA precedent.

Where a plan administrator is given discretionary authority to interpret the terms of a plan, the administrator's interpretation of disputed terms should be upheld if it is reasonable. *See, e.g.*, *Grabowski v. Hartford Life & Accident Ins. Co.*, 747 F. App'x 923, 925 (4th Cir. 2018) ("Where an ERISA plan grants an administrator discretion to award a benefit, we must review its decision only for abuse of discretion and must not disturb the decision if it is reasonable, even if we would have reached a different conclusion.") (cleaned up); *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 344 (4th Cir. 2000) ("Where a plan administrator has offered a reasonable interpretation of disputed provisions, we may not replace it with an interpretation of our own."). The administrator's interpretation need not be the only interpretation, nor even the best interpretation of the plan. *Grabowski*, 747 F. App'x at 926. *See also Strauch v. Exelon Corp.*, No. CIV. JKB-13-1543, 2013 WL 6092520, at *4 (D. Md. Nov. 18, 2013) ("[E]ven if the Court were to find the Plan Administrator's interpretation of the term … was not the *most* reasonable one, that alone would be insufficient to disturb the Plan Administrator's discretionary decision."), *aff'd*, 565 F. App'x 256 (4th Cir. 2014). Here, there is no question that the Board has "full and absolute discretion, authority, and power to interpret … the Plan." Plan Doc. ("PD") § 9.2 [AR-46]. And yet, after acknowledging that this case turns on an issue of Plan interpretation, Miller largely

ignores the tremendous deference paid to interpretations issued by an administrator vested with discretionary authority to interpret a plan's terms.

The Court should reject Miller's claims under this bedrock principle of ERISA jurisprudence. Miller was found to be totally and permanently disabled due to depression and anxiety. To determine when his "disability(ies)" first arose as required for an award of Active Football or Active Nonfootball benefits, PD §§ 3.4(a), 3.4(b) [AR-14], the Board sought to determine when those medical conditions surfaced. After a Plan Medical Advisory Physician ("MAP") gave a final and binding opinion that Miller experienced "clinically significant depression and anxiety" for which he sought and received treatment before he entered the NFL [AR-2384], the Board concluded that Miller's "disability(ies)" did not arise while he was an Active Player in the NFL, and so it denied his request for Active Football and Active Nonfootball benefits.

Miller's attack on the Board's decision unfairly combines mischaracterizations of the record, inapt hypotheticals, and sheer speculation. Miller primarily argues, for example, that the Board's decision must be overturned because no one could possibly interpret the term "disability(ies)" to mean anything other than an inability to perform "some" work. Pl.'s Mem. at 11-13. This argument is undercut by the dictionary definition that Miller cites in two ways. First, the dictionary does not define "disability" the way Miller says. Second, if the dictionary definition applied in Miller's case, it would converge with the Board's interpretation of the Plan, and hurt, not help, Miller's claim for Active benefits.

As another example, Miller argues that the Board has a structural conflict of interest "that decreases any deference it would otherwise be owed." Pl.'s Mem. at 19. Putting aside the fact that this very Court has rejected that argument (along with every

other court to squarely consider it), Miller points to nothing to show that the Board's decision was influenced by any supposed conflict. Nor could he. Even if Miller was right about the Plan's funding and the motivations of the NFL Management Council ("NFLMC") and the NFL Players Association ("NFLPA") (and he is not right on either score), three former players just like Miller serve voluntarily on the Board, and all three voted to deny Miller's request for Active Football and Active Nonfootball benefits. Those three Board members are not beholden to NFL employers or current players. For this reason alone, Miller's speculation about the conflict born from the allegedly competing financial interests of the Board members' "constituencies," Pl.'s Mem. at 18-20, is so completely unfounded it is reprehensible.

The Court should not let Miller's circular, semantic arguments obscure what the Board did and why. When considering whether Miller's "disability(ies)" arose while he was an Active Player in the NFL, the Board tried to ascertain when Miller's ultimately disabling conditions first manifested. The Board's approach flowed from common sense, if nothing else, and reflected a reasonable interpretation of the terms and intent of the Plan. The Court should reject Miller's arguments to the contrary, deny his motion for summary judgment (Dkt. 35), and instead grant Defendants' motion (Dkt. 33) and enter judgment in their favor.

## ARGUMENT

### I. The Court Should Reject Miller's Attempt To Side-Step The Board's Discretionary Authority To Interpret The Terms Of The Plan On The Theory That There Is Only One Objectively Reasonable Interpretation Of The Term "Disability(ies)."

Miller primarily argues that the Plan leaves no room for interpretation because there is "only [one] objectively reasonable" definition of "the term 'disability,'" which

according to Miller is "the inability to work."  Pl.'s Mem. at 12.  *See also id.* at 11

(argument header stating that the Board's decision contradicted the Plan's terms).  This

argument is designed to strip the Board of its discretionary authority to interpret the

Plan.  The Court should reject it.

Miller's argument is belied by the Merriam-Webster's definition that he cites.  As

Miller notes, "disability" is broadly defined there as "a physical, mental, cognitive, or

developmental ***condition*** that ***impairs***, ***interferes with***, ***or limits*** a person's

***ability to engage in certain tasks or actions*** or ***participate in typical daily***

***activities and interactions***."  Pl.'s Mem. at 12 (emphasis added).  The definition

does not tie "disability" to an individual's ability or inability to work, as Miller contends.[1]

---

[1] Miller similarly extends the 1934 *Gates* case beyond its holding.  Pl.'s Mem. at 12.  In *Gates*, the court held that a typhoid-carrying dairy farmer, who was precluded from handling food and drink under a state-imposed quarantine, was not "physically" unable to work within the meaning of his total-and-permanent-disability policy.  The court was construing the term "physical" (not "disability") in a private contract of insurance (not an ERISA plan), and the decision correctly indicates that an impairment (not just an inability to work) is a disability:

> [T]hese cases are not directly in point, but they show the construction which the courts have given to the word "physical" and equivalents.
>
> In view of the fact that plaintiff's bodily strength has not been impaired, and his ability to work has not been interfered with, it cannot, in our opinion, be said that he is physically disabled within the meaning of the policy.  He is prevented from doing certain work solely by the edict of the State.  A man found guilty of a crime and sent to a penal institution might be unable to find work, but such inability could not be attributed to an absence of physical power to work. Plaintiff's disability is due to the statutes of this State.  Statutory or legal disability is not covered by the policy.  When public good with regard to the safety of others steps in and puts a limitation upon his activities, the disability resulting is social in its nature rather than physical.  Plaintiff confuses the result with the cause.  The result is that he has experienced some inability to earn a livelihood, but the cause is not physical impairment of his body.

*Gates v. Prudential Ins. Co. of Am.*, 240 A.D. 444, 448 (N.Y. App. Div. 1934).

Miller goes so far as to proclaim that "[t]here is no objectively reasonable interpretation of the term 'disability' that would apply to … [his] condition before he was an Active Player" in the NFL. Pl.'s Mem. at 13. That position is simply untenable given that Miller's preexisting conditions constituted a "disability" according to the very same Merriam-Webster's definition he recites one page earlier in his brief. Remember: The Board determined that Miller's "disability(ies)" did not arise while he was an Active Player in the NFL after the Plan's Medical Advisory Physician ("MAP"), Dr. Epstein, provided a final and binding report establishing that Miller experienced conditions that plainly impacted his daily life and interactions before he entered the NFL, *i.e.*, "clinically significant depression and anxiety" for which he sought and received treatment. [AR-2384]. Miller's only response is to try to recharacterize the medical evidence, *see, e.g.*, Pl.'s Mem. at 13 (arguing that Miller experienced nothing more than "unpleasant feelings of anxiety" in college), and ignore the final and binding nature of the MAP's conclusions under the terms of the Plan.[2] *See id*. at 9 and n.6 (explaining that Miller was referred for an evaluation with Dr. Epstein, while failing to note that Dr. Epstein was acting as a MAP, and suggesting that the Board's statement that Dr. Epstein's conclusions were final and binding was "not exactly correct"). Defendants would urge the Court not to lose sight of the fact – as Miller seemingly does – that Miller would not be entitled to Active Football or Active Nonfootball benefits even if the Board or this Court adopted the Merriam-Webster's definition that he advances.

---

[2] Miller also accuses Defendants of "attempt[ing] to refine the Board's definition," Pl.'s Mem. at 13, but this accusation misses Defendants' point: The distinction that Miller is attempting to draw between an innocuous medical condition and a "disability" is irrelevant as far as he is concerned, and it does not advance his claim to either of the Active categories of benefits.

## II.    The Board's Interpretation Of The Term "Disability(ies)" Was Reasonable And Consistent With The Intent Of The Plan, And Miller's Attempts To Prove Otherwise Are Meritless.

To fortify his argument that the Board's interpretation was patently unreasonable, Miller reasons that the Board, under its proffered definition of "disability(ies)," would necessarily consider "*any* medical condition" a disability, even if it were "highly unlikely to affect a participant's functioning."  Pl.'s Mem. at 12.  This *argumentum ad absurdum* falters because it is premised on an incomplete and therefore inapposite hypothetical.

Conceivably, a Player could claim to be totally and permanently disabled due to allergic rhinitis (one allegedly innocuous condition that Miller identifies, Pl.'s Mem. at 12).  If a Player actually were totally and permanently disabled by allergic rhinitis, the Board would have to determine when that condition first arose before it could award Active Football or Active Nonfootball benefits.  And if the condition first arose before the Player entered the NFL, that Player, like Miller, would not be entitled to either category of benefits.  When viewed from a practical perspective rather than in the abstract, there is nothing inherently absurd about the Board's interpretation and application of the Plan.  It recognizes that "disability(ies)" exist on a continuum, and when they first ***arise***, when they become disabling (under any definition), and when they become totally and permanently disabling are different questions with potentially different answers.

Miller's related argument is similarly inapt.  Responding to Defendants' contention that his position unreasonably conflates a "disability(ies)" with the concept of total and permanent disability, Miller "imagine[s]" a scenario in which "disability(ies)" could be interpreted differently – and to his advantage – as an inability

to perform "some work, but not all work." Pl.'s Mem. at 13. According to Miller, his preferred interpretation would not upset the Plan because it would preserve the distinction between mere "disability(ies)" and total and permanent disability. *Id*. at 13-14. But in this reimagining of the Plan, Miller again fails to see that the question of when a "disability(ies)" first ***arises*** is conceptually distinct from when the condition becomes disabling to the extent that it prevents a Player from performing some, or for that matter all, work.

Miller also notably stops short of explaining how such a distinction would fit within the Plan's administrative process, or why it would advance the Plan's goals. The Plan exclusively utilizes an any-occupation standard to provide total and permanent disability benefits to former NFL players, many of whom have never held or sought to hold another job after leaving the NFL. In other words, when a Player becomes unable to perform "some work, but not all work," is not and has never been a Plan endpoint. While there may be a distinction between partial disability and total disability as Miller posits, to the extent such a distinction has relevance under the Plan, an inability to perform "some work, but not all work," is a preclusion to Plan T&P benefits, not a first step to obtaining them.

The Plan also plainly and quite sensibly reserves Active Football and Active Nonfootball benefits – its two highest-paying categories – for Players who rapidly become totally and permanently disabled due to injuries, accidents, or conditions that arise while they are Active Players in the NFL, not conditions that existed before they ever stepped onto the playing field. Miller does not contest that the Board's interpretation should, and does, advance this obvious objective. *See Booth*, 201 F.3d at 342 (noting that one of the "criteria for determining the reasonableness of a fiduciary's

discretionary decision" is whether it advances "the purposes and goals of the plan"). Instead, Miller expounds on the purpose of preexisting-condition exclusions in other types of plans. Pl.'s Mem. at 17-19. Even if Miller's exposition is accurate, it does not undermine the Board's decision. This Plan provides multiple levels of T&P benefits to Players who become totally and permanently disabled at any point, and for any reason. So while the "adverse selection" that Miller describes may not be a concern for "this Plan," Pl.'s Mem. at 17, the collective bargaining parties agreed to provide the Plan's highest-paying benefits to Players who become totally and permanently disabled by conditions that arise during their NFL career, not conditions that arose before (or after). The standards that the Plan uses to accomplish this goal are not non-existent, as Miller argues. Pl.'s Mem. at 18-19. The standards result from extensive labor-management negotiations; they are then incorporated into the Plan document; and the Board, using its lawfully-granted authority and discretion, must ultimately give effect to those standards when it decides benefit claims like the one at issue here. *See, e.g.*, PD § 9.2 [AR-46] ("The Disability Board will have full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan and the Trust.").

### III. <u>Miller Has No Basis To Suggest That The Board Has Treated Him Differently Or Offered Inconsistent Plan Interpretations.</u>

Miller's claim that the Board treated him differently is entirely unfounded, and the Court should reject it.

Miller first argues that the lack of any evidence of inconsistent interpretations on the part of the Board is *prima facie* evidence that the Board has applied inconsistent interpretations. Pl.'s Mem. at 15 ("This absence is, in and of itself, evidence that the Board has arbitrarily changed its interpretation of the Plan."). The lack of evidence does

not permit any such presumption, however. As Miller knows, Defendants' search for prior, relevant decisions was limited, by agreement, to decisions issued in the decade preceding the Board's decision on Miller's claim. *See* 10/26/22 Ltr. fr. M. Junk to T. Renaker (Dkt. 35-11) at 1 (explaining that Defendants' counsel limited their review to decision letters issues since 2012). Furthermore, Defendants informed Miller that many of the Board's prior decisions turned not on when a Player's "disability(ies)" arose, but on other dispositive issues related to the strict standards historically associated with the Active Football and Active Nonfootball categories. *Id.* at 1 ("The vast majority of the decisions are irrelevant because they focus on the Boards' determination that the Player failed to meet the 'shortly after' requirement that the bargaining parties removed from the Plan in 2018, for example, or other Plan standards that are not at issue here.").

Next, Miller argues that he has actually identified exactly one prior decision from February 2020, just months before the Board decided his application, where the Board "reached the opposite conclusion, [and] determin[ed] that a [P]layer with medical conditions that predated his NFL career and worsened during his NFL career had a disability that arose while he was an Active Player." Pl.'s Mem. at 15. In fact, the prior case did not involve a Player with medical conditions that predated his NFL career. Closer inspection of the "case summary" that Miller cites reveals that the Player suffered a concussion during his time in the NFL, and that concussion apparently led to "significantly elevated levels of emotional distress," Dkt. 35-10 [SUMS-15], that in turn caused the Player to be totally and permanently disabled. Unlike Miller, there was no question about when the Player's totally and permanently disabling conditions arose, much less a final and binding opinion from a MAP psychiatrist that the conditions arose

before the Player's NFL career.[3]  This lone, prior case was materially different from Miller's, and it proves nothing.  Miller's baseless argument to the contrary exemplifies why litigants and courts should be reluctant to draw conclusions about the consistency of a plan administrator's prior decisions from reconstructions of isolated events and piecemeal records.

Finally, Miller points to *Giles*, a case previously decided by this Court that Defendants highlighted in their opening brief, to show that the Board "historically … equated 'disability' with 'the inability to work'" until it suddenly changed course when it decided Miller's application.  Pl.'s Mem. at 16.  *Giles* shows no such thing.[4]  In *Giles*, the question was not when Mr. Giles' "disability(ies)" first arose as it is here, but whether his "disability(ies)" arose out of NFL football activities.  *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. CIV.A. ELH-12-634, 2013 WL 6909200, at *19 (D. Md. Dec. 31, 2013) (Hollander, D.J.).  Nevertheless, the dispute centered on what "disability(ies)" meant in that context.  *Id.* ("In essence, the parties disagree as to the meaning of the term 'disability' as it is used in Plan § 5.1.").  As the Court may recall, the Board interpreted "disability(ies)" essentially to mean the status of being disabled (under the unique circumstances presented by Mr. Giles' case), whereas Mr. Giles argued that "disability(ies)" meant only "the [P]layer's physical condition."  *Id.*  After observing that

---

[3] The Board did question whether the Player's totally disabling psychiatric conditions were caused by NFL-related head trauma (an exception that would allow the Player to receive Active Football benefits).  *See* PD § 3.5(b) [AR-16].  The Board referred that question to a MAP psychiatrist (Dr. Epstein) for a final and binding opinion, as Miller notes.  Pl.'s Mem. at 16.

[4] The fact that cases like *Giles* mention "disability" and "inability to work" in the same sentence is unsurprising given that the cases concern total and permanent disability benefits and the standards that surround them, including whether Players are able to work in any occupation for remuneration or profit.

the Board had long endorsed Mr. Giles' interpretation, *id*. at *20, this Court went on to hold that "the language and structure of the Plan confirm" that "disability(ies)" does not mean the status of being disabled, but rather a "medical condition." *Id*. at *23. *Giles* therefore demonstrates two things. One, it shows that the Board has historically read "disability(ies)" to mean an underlying medical condition. Two, the decision also implicitly — if not explicitly — rejects what Defendants understood Miller's basic argument to be, namely that "disability(ies)" can only mean the status of being disabled in some way.

## IV.    There Is No Structural Conflict, And No Reason To Lessen The High Level Of Deference This Court Owes To The Board's Decision.

In two short paragraphs, Miller invites the Court to pay less deference to the Board's decision than it normally would on the theory that the Board "operates under a financial conflict of interest." Pl.'s Mem. at 19. The Court should reject this invitation, as it and every other court has done before.

*Durakovic* is the only legal authority Miller offers to support the proposition that a Taft-Hartley board comprised of an equal number of employer- and employee-appointed representatives suffers from a so-called "financial conflict." Pl.'s Mem. at 19. *Durakovic* is a more than decade-old Second Circuit opinion that, to Defendants' knowledge, has not been adopted by the Fourth Circuit or any other circuit for that matter. *See generally Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133 (2d Cir. 2010). Meanwhile, this Court and every other court to consider whether this Board is conflicted has held that it is not, specifically rejecting *Durakovic* in the process. *See, e.g.*, *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 717 (D. Md. 2012) (Hollander, D.J.) ("I agree entirely with Judge Motz and the other judges in

this district who have reached similar conclusions, and hold that the Plan does not operate under a structural conflict of interest and, in the alternative, that the effect of any such conflict would be strongly outweighed by other structural protections of the Plan."); *Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682, 690-91 (D. Md. 2011) ("In this District, two post-*Glenn* courts have held that the Board is not conflicted by virtue of its composition. I find the reasoning of these cases to be persuasive, and I too hold that the Board does not suffer from a conflict of interest.") (citations omitted) (citing *Stewart v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, No. 1:09-cv-02612-WDQ, 2011 WL 10005532 (D. Md. Jan. 13, 2011); *Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 1:08-cv-01870-WMN (D. Md. Oct. 22, 2008), Dkt. 22).

Miller's attempt to prop up *Durakovic* with a purported forensic analysis of the collective bargaining agreement ("CBA") between the NFLMC and the NFLPA, Pl.'s Mem. at 19-20, and factors never-before-raised-in-court, *id.* at 20, n.14, fails on multiple levels.

As an initial matter, Miller's arguments are not new. In *Stewart*, for example, the plaintiffs raised, and the court rejected, arguments virtually identical to Miller's:

> In considering plaintiff's conflict of interest claim, the undersigned finds persuasive the reasoning embraced by the court in *Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* No. WMN-08-1870, slip op. at 4–6 (D. Md. 2008), which addressed the same issue currently before this court. In *Sagapolutele,* the plaintiffs, former NFL players, sought additional discovery relevant to their claim that the NFL Retirement Board was conflicted because the player representatives appointed by the NFL Players Association ("NFLPA") represent both active and retired players, and any benefits paid out of the plan to retired players come from the same pool of money available for salaries of active players. *Id.*

at 4. The court rejected this argument, reasoning that, because the Board is composed equally of player and employer representatives and a majority vote is required to resolve a benefits claim, "any alleged conflict that the NFLPA might have is not enough to confer a conflict of interest on the entire Board." *Id.* at 5.

Plaintiff attempts to distinguish *Sagapolutele* by arguing that it does not address whether the NFL's funding of the Plan creates a conflict because its representatives also decide claims. As defendant points out, and consistent with the court's reasoning in *Sagapolutele,* however, the 32 NFL clubs fund the plan but they do not make decisions about benefits — the Board does — and any decision requires a majority vote of the equally divided employer and player representatives.

2011 WL 10005532, at *2 (record citation omitted).

Second, Miller's counsel is wholly unqualified to provide any meaningful analysis of the CBA, including its provisions for funding benefits for current and retired athletes and the resulting impact those complex funding arrangements have on the day-to-day financial concerns and operations of the 32 separate teams and their current employees. By reciting various CBA provisions, Miller undoubtedly hopes to give his argument a superficial gloss of sensibility. But the argument quickly falls apart when one realizes that the Plan at issue here is merely one among seven Taft-Hartley plans and a series of non-Taft-Hartley plans, all of which are implicated by the CBA's funding arrangements;[5] the bargaining parties have continued, and in most cases improved, benefits under all of these plans with each successive CBA; and if the bargaining parties ever had concerns of

---

[5] The CBA establishes and maintains the following Taft-Hartley plans: (1) the Bert Bell/Pete Rozelle NFL Player Retirement Plan; (2) the NFL Player Disability & Neurocognitive Benefit Plan; (3) the 88 Plan; (4) the Gene Upshaw NFL Player Health Reimbursement Account Plan; (5) the NFL Player Annuity Program; (6) the NFL Player Capital Accumulation Plan; and (7) the NFL Player Second Career Savings Plan.

any kind about the rising cost of disability benefits, they could control those costs either by adjusting other Player benefits, or by unilaterally reducing disability benefits or eliminating them entirely. *See, e.g.*, *Cason v. Nat'l Football League Players Ass'n*, 538 F. Supp. 3d 100, 114 (D.D.C. 2021) ("Although welfare plans have to be 'established and maintained pursuant to a written instrument,' 29 U.S.C. § 1102(a)(1), 'employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.'") (alteration omitted) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).  The system is not as simplistic as Miller would like this Court to believe.  Simply put:  The bargaining parties do not have to deny Miller's claim for Active Football or Active Nonfootball benefits — or any other Player's claim for benefits — to control disability costs or the total spend on all pension, health, and welfare benefits that the bargaining parties provide to current and former players, and no such conflict can reasonably be attributed to the NFLPA- or NFLMC-appointed Board members.

Finally, Miller's argument about the Plan's funding arrangements and the resulting "conflict between the financial interests of the Board members' constituencies," Pl.'s Mem. at 20, fails for an additional reason.  Three Board members are former players, just like Miller.  *See* Dkt. 35-8 [MIN-14] (Board meeting minutes identifying the three NFLPA-appointed Board members as Sam McCullum, Robert Smith, and Jeff Van Note).  These former players serve as Board members voluntarily, without compensation, and they are not beholden to current NFL employers or current player interests.  So even if one were to accept the premise of Miller's argument, the

presence of these three former players on the Board negates any inference that the Board as a whole is conflicted or incentivized to deny Player applications.[6]

Even if the Board had a structural conflict, the Court may dispense with this issue because there is no evidence that any such conflict impacted the Board's decision or its review of Miller's claim, only Miller's bare allegations of a purported conflict. *See Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 383 (4th Cir. 2018) (rejecting a conflict-of-interest argument where the plaintiff provided no evidence that the alleged conflict impacted the administrator's decision, and thus there was no support for "any reasonable inference" that the administrator acted out of "bias or self-interest"); *Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 958 (4th Cir. 2010) ("The record here leaves solely the conflict of interest as an indicium of unreasonableness. Accordingly, this factor, in isolation, is insufficient for this court to conclude that the trial court erred in its determination.").

## V.    Remand To The Board Is The Appropriate Remedy If The Court Finds That the Board Abused Its Discretion.

Miller indicates that remand is inappropriate under any scenario because there is no dispute that he is entitled to Active Football benefits. Pl.'s Mem. at 23. The answer is not clear-cut, however, particularly given that Miller brought two claims for relief: one seeking Active Football benefits, and the other alternatively seeking Active Nonfootball benefits. Compl. (Dkt. 1) at 9-11.

---

[6] Miller's accusation that the Plan's Neutral Physicians are "not independent," Pl.'s Mem. at 20, n.14, is unfounded for the same reason. The Plan does compensate its Neutral Physicians for their time and expertise. That should be unsurprising. Miller cannot explain why a Neutral Physician – no matter how much (s)he is paid – would be incentivized to offer opinions undercutting Player applications to a Taft-Hartley board comprised of three former players.

Defendants respectfully submit that if the Court finds in favor of Miller, then the Board should be tasked with deciding, in the first instance, which of the Active categories Miller is entitled to receive under a "proper" interpretation of the term "disability(ies)." Miller's entitlement to Active Football versus Active Nonfootball benefits turns on the application of additional Plan terms and the resolution of additional factual questions — both issues that are properly left to the sound discretion of the Board, not the Court. *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323 (4th Cir. 2008) (cautioning that a court should not "forget its duty of deference and its secondary rather than primary role in determining a claimant's right to benefits").

As Defendants noted in their opening brief, a key issue for the Board on remand would likely be, for example, whether and how the Plan's special rules for psychiatric/psychological conditions apply to Miller. PD § 3.5(b) [AR-16]. Under those rules, Miller would be ineligible for Active Football benefits unless the Board concludes that (1) he meets the requirements for Active Football benefits, and (2) his totally disabling psychiatric/psychological condition is "caused by or relate[d] to a head injury (or injuries) sustained by [Miller] arising out of League football activities (*e.g*., repetitive concussions)." PD § 3.5(b) [AR-16]. *See also* Compl. ¶ 21 (conceding that the Plan's special rules are an added requirement for Players seeking Active Football benefits based on psychiatric/psychological conditions). While Miller maintains that his current depression and anxiety fall within the special rules because they unquestionably stem

from "head trauma" sustained in the NFL, Pl.'s Mem. at 23, the record contains substantial evidence to support a contrary conclusion.[7]

Miller argues that it would be inappropriate for the Board to consider these questions on remand because it could have addressed them the first time around. Pl.'s Mem. at 24. But the Board did not have to reach these questions to resolve Miller's application, just like this Court may not have to reach every argument or resolve every conceivable issue to render a ruling in litigation. If Miller's "disability(ies)" arose before his NFL career, as the Board concluded, then Active Football and Active Nonfootball benefits were off the table without the need for any further analysis. Likewise, the special rules would come into play only if Miller were otherwise eligible for Active Football benefits. Since he was not eligible for Active Football benefits, the Board had no need to consider whether those additional rules applied. Further analysis would have been an academic exercise in tension with the Board's predicate conclusion that Miller's conditions arose before his NFL career.

Miller objects to the delay that would come with a remand to the Board. Pl.'s Mem. at 24. He points to nothing, however, to show that he would be unduly or unfairly prejudiced by any minor delay occasioned by this Court's faithful application of ERISA

_____

[7] Miller acknowledges (as he must) that in 2017 he was arrested and criminally charged following "a dispute with his then-wife." Pl.'s Mem. at 4. In a footnote, Miller explains that the incident was no big deal because "charges were never brought or were dropped," *id*. at 4, n.2, and so it was unfair for Defendants to suggest that the matter could have possibly contributed to Miller's anxiety and depression. The Court can make what it will of Miller's claimed nonchalance in the face of multiple pending legal/criminal matters. While some or all of the charges against Miller may have ultimately been dismissed, it remains true that he was suspended from the League for his actions; he faced multiple criminal charges; and charges for child abuse were pending against him when he applied for T&P benefits in June of 2019. *See* [AR-108] (cover letter forwarding T&P application dated June 11, 2019); [AR-2391- 92] (article noting that child abuse charges were lodged in April and dropped in August of 2019).

precedent, which, Defendants submit, would require a remand in the event the Court rules in Miller's favor on the Plan-interpretation issue presented here.

## **CONCLUSION**

The Court should deny Miller's motion for summary judgment, and instead grant Defendants' motion and enter judgment in their favor. Alternatively, if the Court finds that the Board abused its discretion, the Court should remand Miller's claim to the Board for reconsideration.

Dated: January 20, 2023

Respectfully submitted,
GROOM LAW GROUP, CHARTERED

By: _____

Michael L. Junk, Bar No. 19551
Edward J. Meehan, Bar No. 04775
1701 Pennsylvania Avenue NW
Washington, DC 20006
P: (202) 857-0620
F: (202) 659-4503
mjunk@groom.com
emeehan@groom.com

COUNSEL FOR DEFENDANTS

NFL PLAYER DISABILITY &
NEUROCOGNITIVE BENEFIT PLAN,
and DISABILITY BOARD

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed with the Clerk of Court via CM/ECF, which will automatically send a notice of electronic filing to counsel of record for all parties.

Dated:  January 20, 2023

GROOM LAW GROUP, CHARTERED

By: _____

Michael L. Junk, Bar No. 19551
1701 Pennsylvania Avenue NW
Washington, DC 20006
P: (202) 857-0620
F: (202) 659-4503
mjunk@groom.com

COUNSEL FOR DEFENDANTS

NFL PLAYER DISABILITY &
NEUROCOGNITIVE BENEFIT PLAN,
and DISABILITY BOARD